CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 2 5 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

IRA D. SOCOL,                                    )
                                                 )
            Plaintiff,                           )
                                                 )
                                                 )        Civil Action No. 3:18CV00090
v.                                               )
                                                 )        **MEMORANDUM OPINION**
ALBEMARLE COUNTY SCHOOL BOARD,                   )
                                                 )        By: Hon. Glen E. Conrad
and                                              )        Senior United States District Judge
                                                 )
MATTHEW S. HAAS, individually and as             )
Superintendent of Albemarle County Public        )
Schools,                                         )
                                                 )
            Defendants.                          )

Ira D. Socol, a former employee of the Albemarle County Public Schools ("School System"), filed this action against the Albemarle County School Board ("School Board") and the Superintendent of Schools, Matthew S. Haas, asserting claims under 42 U.S.C. § 1983 and Virginia law. The case is presently before the court on the defendants' motion to dismiss. For the reasons set forth below, the motion will be granted in part and denied in part.

**Background**

The following facts are taken from the amended complaint and documents relied on therein. See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999) (noting that the court can properly consider documents that are "integral to and explicitly relied on in the complaint" when ruling on a motion to dismiss).

In February of 2013, Socol was hired to work as the Design Project Manager for the School System's Design 2015 project. Am. Compl. ¶ 10. He became the Assistant Director of Educational Technologies in March of 2015. Id. ¶ 11. In July of 2017, Socol was selected to

direct the Department of Accountability, Research and Technology, which was subsequently reorganized into the Department of Learning, Engineering, Access, and Design ("LEAD Department"). Id. ¶¶ 12–13.

On or about March 5, 2018, Haas, who was then Deputy Superintendent of Schools, informed Socol that he was Haas' choice to assume the new role of Chief Technology and Information Officer ("CTIO"). Id. ¶ 14. At the time of their discussion, Haas had been selected to replace Pamela Moran as Superintendent. Haas was aware that Socol had been considering other professional opportunities outside the School System. Id. ¶ 17. In order to convince the plaintiff to forego other job opportunities, Haas agreed to the salary requested by the plaintiff. Id. ¶ 18. Haas also agreed that Socol would remain in the position of CTIO throughout Haas' forthcoming tenure as Superintendent. Id. ¶ 19. Haas indicated that he "expected to serve two four-year terms."[1] Id. Based on Haas' representations, Socol agreed to accept the position. Id. ¶¶ 19–20.

The School System publicly announced that Socol had been named the CTIO on April 24, 2018. Id. ¶ 20. On July 1, 2018, Haas assumed the title of Superintendent. Id. ¶ 16. In his role as CTIO, Socol was the head of the LEAD Department. Id. ¶ 27. He reported directly to Haas. Id. ¶ 16.

Socol was heavily involved in the development of a new pilot high school center known as Albemarle Tech. Id. ¶¶ 30–31. Haas appointed Socol and several other School System employees to a committee responsible for overseeing the project (the "Steering Committee"). Haas "made [Assistant Superintendent Deborah] Collins the senior member of the committee" and "Lindsay Snoddy the Project Manager," and he "gave Rosalyn Schmitt, then the Director of

---

[1] Under Virginia law, "[t]he division superintendent shall serve for an initial term of not less than two years nor more than four years." Va. Code § 22.1-60. "At the expiration of the initial term, the division superintendent shall be eligible to hold office for the term specified by the employing school board, not to exceed four years." Id.

Finance and Facilities, financial oversight." Id. ¶ 33. The Steering Committee was tasked with opening a new technical high school, a new space for the LEAD Department, and a new professional learning center, all of which would be located in the same leased space. Id. ¶ 34. The Steering Committee had approximately five months from its formation to complete its work and open the new space to students and administrators. Id.

The School Board gave the Steering Committee a budget of $250,000 to be used for furnishing the entire project. Id. ¶ 38. The budget included professional services, cabling, acoustical paneling, carpeting, and furniture. Id. The allotted funding had to be spent by June 30, 2018. Id.

Two of the Steering Committee members proposed hiring Jennifer Greenhalgh, a local interior designer, to develop furnishing plans for the project at a cost of $150.00 per hour. Id. ¶ 39. Socol opposed the proposal, believing that it would be a waste of money and that the Steering Committee, with the assistance of the Building Services Department, could do the work. Id. However, the other committee members disagreed with Socol and elected to retain Greenhalgh to work on the project. Id. Greenhalgh subsequently provided the Steering Committee with a list of recommended furnishings that totaled $488,000, excluding professional fees, appliances, cabling, carpeting, and furniture for certain areas. Id. ¶ 40.

After receiving Greenhalgh's proposal, the Steering Committee asked Elodie Wolfe, an office assistant partially assigned to the LEAD Department, to compile a list of furnishings that would be more in line with the Steering Committee's budget. Id. ¶ 41. In late April or early May 2018, Wolfe provided a presentation to the Steering Committee, which included Greenhalgh's recommendations, as well as a variety of alternative furnishings from vendors such as Wayfair and IKEA. Id. ¶ 42. "Without objection from any of its members, the Steering Committee approved

3

the purchase of the items in Ms. Wolfe's alternate recommendations and, as the meeting unfolded, those items were all placed in a Google spreadsheet to which all committee members had access." Id. The spreadsheet included the particular project and room for which an item was purchased, the advertised price, the final negotiated price, the date ordered, and the purchase card ("P-Card") used to make the purchase. Id. ¶ 43.

Socol alleges that the Steering Committee agreed that the LEAD Department's P-Cards would be used to make the furniture purchases approved by the committee. Id. ¶ 44. "In some cases, multiple LEAD P-Cards were used to make furniture purchases because such purchases would have exceeded the available limit on any one such P-Card, which was clearly noted in the [s]preadsheet." Id. ¶ 45. The total amount of the purchases exceeded $50,000. Id. ¶ 46. However, "no one project (Albemarle Tech, the LEAD space, or the professional learning center) had furnishings that cost in the aggregate in excess of $50,000." Id. Additionally, "[n]one of the individual pieces of furniture (nor any group of furnishings for any one space or purpose) authorized for purchase by the Steering Committee exceeded $5,000 in cost." Id. ¶ 47. Socol further alleges that none of the committee members objected to the purchases, "either as to the items purchased or as to the manner in which such purchases were made." Id. ¶ 48.

On May 28, 2018, Socol received an email from Thomas Winder, the Purchasing Agent for Albemarle County, questioning the fact that multiple furniture purchases had been made from the same vendor. Id. ¶ 50. Socol discussed the furniture purchases with Reeda Deade, who handled the budget for the LEAD Department. Deade advised Socol that "'this is what we do all the time' [and] 'no one's ever said anything.'" Id. ¶ 50.

After receiving Winder's email, Socol requested a meeting with Winder "so that he could understand what, if anything, had been done wrong and how any issues could be resolved." Id.

4

¶ 51.   On June 11, 2018, Socol met with Winder and other individuals, including Assistant County Attorney Amanda Farley.   Id. ¶ 53.   During the meeting, Farley "argued that the furniture purchases for the three separate projects should have been aggregated, and as aggregated, would have required competitive bidding."   Id. ¶ 54.

On June 14, 2018, the School Board held a closed meeting during which it ultimately approved the furniture purchases made by the Steering Committee.   Id. ¶ 57.   Socol subsequently learned from Haas that three School Board members had voted against approval, and that one of the members had suggested that Socol should be fired.   Id. ¶ 59.

On July 20, 2018, Socol met with John Gray, Assistant Director of Human Resources, and Clare Keiser, then Director of Educational Quality, to discuss the purchasing.   Id. ¶ 60.   During the meeting, Keiser accused Socol of purchasing furniture for his own benefit.   Id.   Socol advised Gray and Keiser that such accusation was both untrue and unfair.   Id.   Socol alleges that neither he nor anyone else received any improper benefit as a result of the furniture purchases, and that the Steering Committee's only goal was to complete the project on time and within budget.   Socol further alleges that the furniture in question remains in use today.   Id.

On July 27, 2018, Haas and Keiser met with Socol and advised him that his time with Albemarle County had "'come to an end.'"   Id. ¶ 66.   When Socol objected, Haas advised him that he had "'no rights here.'"   Id.   Haas offered to allow Socol to resign and receive a severance package if Socol would not speak publicly about Haas' actions.   Id.   However, Socol refused to resign.   Id.   On August 1, 2018, Haas sent Socol a letter terminating Socol's employment as of that date.   Id.

At some point, the School System prepared an investigation report concluding that Socol had violated Albemarle County procurement policies ("Investigation Report").   Id. ¶ 70; see also

Investigation Report, Dkt. No. 15-2. The Investigation Report was not shared with Socol until after his termination. Id. ¶ 70. Socol alleges that he did not receive a meaningful opportunity to contest the findings in the report. Id.

The School System has a written policy applicable to the termination of employment as a result of resignation, layoff, or dismissal ("Termination Policy"). Termination Policy, Dkt. No. 9-1. The policy defines "dismissal" as "an involuntary separation from employment due to disciplinary infractions or inability to perform the work." Id. at 1. In the case of dismissal, "it is expected that the principal/department head/designee has thoroughly investigated the incidents leading to the dismissal, has documented any action taken, and has applied discipline in a fair and consistent fashion." Id. The Termination Policy further provides as follows:

> A. The Board shall make the final decision on all recommendations by the Superintendent for the dismissal of licensed personnel. A vote of the majority of a quorum [of] the Board is necessary for dismissal.
>
> B. The Superintendent may dismiss classified employees and non-licensed administrative employees for good and just cause. A dismissed employee may appeal the decision under the approved grievance procedure, except for classes of employees as defined in Policy GBMA.

Id. at 2.

Socol was a non-licensed administrative employee at the time of his termination. Am. Compl. ¶ 74. He did not receive any form of pre-termination hearing, and he was "not within the class of employees who have post-termination grievance rights." Id. ¶¶ 75–76.

The plaintiff was the only employee who was terminated for the furniture purchases made by the Steering Committee. Id. ¶ 79. None of the other committee members were disciplined in any manner, even though the entire committee approved the purchases. Id. The plaintiff alleges that Snoddy, Collins, and Schmitt, "who were the members of the Steering Committee best able to

6

ensure compliance of the furniture purchases with the procurement regulations, have not only not been disciplined, but have been promoted." Id. ¶ 80.

Socol alleges that Haas made or published statements about his termination to "multiple people" outside the School System. Id. ¶ 137. On the same day that Socol was given the choice to resign or be terminated, Hass called Moran, the former Superintendent, and advised her of the termination decision and the alleged reasons for it. Id. ¶ 90. Socol alleges that he and Moran are co-authors and business associates, and that Haas was aware of their professional relationship at the time he contacted Moran. Id. ¶ 91. During the phone call, Haas indicated that Socol had "'misused P-Cards deliberately and egregiously'" and that he had "'admitted to the conduct in the [Investigation] Report.'" Id. ¶¶ 93, 96. Socol alleges that Haas' statement was completely false and that it impugned his reputation for honesty, integrity, and morality. Id. ¶ 94. Socol further alleges that Haas suggested that the termination would have a deleterious effect on the sales and publicity of the book that Socol had co-authored with Moran, and that Socol could have avoided the problem by resigning and accepting a severance agreement. Id. ¶¶ 98–99.

On August 1, 2018, the School System issued a press release announcing that Socol was "no longer . . . employed by the school division" and that Jamie Foreman, the Deputy Technology and Innovation Officer, had been chosen to head the LEAD Department on an interim basis. Id. ¶ 101; see also Press Release, Dkt. No. 15-1. The press release highlighted Foreman's qualifications and the services provided by the LEAD Department. Id.

Socol alleges, upon information and belief, that Haas also informed Kevin Castner, another former Superintendent of Schools, of the alleged reasons for Socol's termination. Id. ¶ 103. Within two weeks of the adverse employment decision, Castner called Socol to discuss potential job prospects. Id. ¶ 104. During the phone call, Castner suggested that information publicized

7

regarding Socol's termination could hinder Socol's ability to obtain a job with another school division. Id.

Socol alleges that the School System "did not provide [him] with a pre-publication hearing before its agents publicized the alleged reasons for [his] termination, despite the fact that those reasons implicate his good name and reputation." Id. ¶¶ 112. Socol further alleges that the publication of the alleged reasons for his termination has prejudiced him in his profession. Id. ¶ 113. For instance, an educational furnishings company withdrew a preliminary offer after learning about Socol's termination. Id. ¶ 105. "Likewise, the manner of [the plaintiff's] termination cost him a professional opportunity with BCWH Architects." Id. ¶ 106.

### Procedural History

Socol filed the instant action against the School Board and Haas on October 1, 2018. The defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On January 28, 2019, the court held a hearing on the defendants' motion. At the conclusion of the hearing, the court took the motion under advisement and granted the plaintiff leave to file an amended complaint.

On February 7, 2019, Socol filed an amended complaint against the defendants, in which he asserts the following claims: denial of due process in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Counts I and II); breach of contract (Count III); and defamation per se (Count IV). In response, the defendants renewed their motion to dismiss.[2] The matter is now ripe for review.

---

[2] The plaintiff has moved to strike two email exhibits submitted in support of the defendants' supplemental brief. The court finds it unnecessary to consider the challenged exhibits at this stage of the proceedings. Accordingly, the motion to strike will be denied as moot.

8

## Standard of Review

Rule 12(b)(6) permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. When deciding a motion to dismiss under this rule, the court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in the plaintiff's favor. Erickson v. Pardus, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). One such defense is the statute of frauds. See ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) ("[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense like the statute of frauds appears on its face."); see also Greenbelt Ventures, LLC v. Wash. Metro. Area Transit Auth., 481 F. App'x 833, 837–39 (4th Cir. 2012) (holding that a contract claim was barred by the statute of frauds and therefore properly dismissed under Rule 12(b)(6)).

9

## Discussion

### I.     Claims under § 1983

The court will first address Socol's claims under 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. See 42 U.S.C. § 1983. In Count I, Socol claims that the defendants deprived him of a property interest in continued employment without providing due process. In Count II, Socol claims that the defendants deprived him of a liberty interest in his reputation and good name without affording him due process.

The due process clause of the Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to establish a due process violation, "a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (citations omitted). If the plaintiff makes such showing, the court considers what process was required and whether any provided was adequate in the particular factual context. Id.

### A.     Property Interest

In moving to dismiss Count I, the defendants contend that Socol has failed to demonstrate that he had a constitutionally protected property interest in his continued employment as CTIO. For the following reasons, the court agrees.

In the public employment context, "it is not enough for a plaintiff to demonstrate that he has lost his job." Herman v. Lackey, 309 F. App'x 778, 783 (4th Cir. 2009). "Instead, the

relevant inquiry is whether the plaintiff possessed a protectable property interest in his . . . continued employment." Id. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 579 (1972). "Thus, only where the employee has a legitimate entitlement to continued employment do the requirements of due process attach." Royster v. Bd. of Trustees., 774 F.2d 618, 621 (4th Cir. 1985) (citations omitted).

Property interests are not established by the Constitution. Rather, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Roth, 408 U.S. at 577. "In the context of employment in public education, the independent source for the property interest has been said to be a contract which provides for continued employment, and which can be terminated only for good cause." Royster, 774 F.2d at 620–21 (citations omitted); see also Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'") (citations omitted). If an employee is terminable at will under state law, then he has no protected property interest in continued employment. See Herman, 309 F. App'x at 783 ("An at-will employment relationship does not create a protectable property interest in continued employment for § 1983 purposes.") (citing Roth, 408 U.S. at 577–78); see also Cominelli v. Rector & Visitors of the Univ. of Va., 589 F. Supp. 2d 706, 713 (W.D. Va. 2008) ("In Virginia, an at-will government employee 'has no legitimate expectancy of continued employment and thus has no protectible property interest.'") (quoting Jenkins v. Weatherholtz, 909 F.2d 105, 107 (4th Cir. 1990)).

11

In this case, it is undisputed that Socol had no written contract for continued employment with the School Board.[3]  Socol nonetheless argues that two sources gave rise to an enforceable expectation of continued employment.  He first points to his conversation with Haas in March of 2018, during which they allegedly agreed that Socol would remain in the position of CTIO for the duration of Haas' tenure as Superintendent.  See Am. Compl. ¶ 18; see also Pl.'s Br. Opp'n 12, Dkt. No. 9 (asserting that the plaintiff and Haas had a mutually explicit understanding that "his time as CTIO would span <u>many years</u>") (emphasis added).  Socol also cites to the Termination Policy that permits the Superintendent to dismiss non-licensed administrative employees for good and just cause.

The plaintiff's reliance on the alleged oral agreement in March of 2018, when Haas was Deputy Superintendent, suffers from two fatal flaws.  First, Socol does not cite, and the court has not located, any authority indicating that an assistant or deputy superintendent has the power to bind a public school board to an employment contract.  To the contrary, "Virginia authorities suggest that a <u>superintendent</u> is not an agent for a member of the school board, [and cannot] enter into or terminate contracts in areas normally reserved to the school board."  <u>Dennis v. Cty. Sch. Bd.</u>, 582 F. Supp. 536, 542 (W.D. Va. 1984) (emphasis added) (citing <u>Legg v. Cty. Sch. Bd.</u>, 160 S.E. 60 (1931)).  Such areas plainly include employment contracts.  See Va. Code § 22.1-313 ("The school board shall retain its exclusive final authority over matters concerning employment and supervision of its personnel."); <u>Id.</u> § 22.1-293 ("A school board, upon recommendation of the division superintendent, may employ principals and assistant principals."); <u>Id.</u> § 22.1-302 ("A written contract . . . shall be made by the school board with each teacher employed by it . . . ."); 8

---

[3] In Virginia, "[s]chools are required by state law to issue contracts to teachers, principals, assistant principals, and 'supervisors.'"  <u>Sullivan v. Warren Cty. Sch. Bd.</u>, 49 Va. Cir. 226, 229 (Va. Cir. Ct. 1999) (citing Va. Code §§ 22.1-302, 22.1-294).  "The term 'supervisor' as statutorily defined is limited to a few positions for which a license is required by the Board of Education."  <u>Id.</u>  Because Socol was a "non-licensed administrative employee," Am. Compl. ¶ 74, a written contract was not required under state law.

Va. Admin. Code § 20-490-20 ("Contracts with teachers shall be executed on behalf of the [school] board by the chairman and the clerk.").

Second, as discussed more fully below, it is clear from the amended complaint that the alleged oral agreement contemplated employment for a term of more than one year. Because the agreement was not reduced to writing, it does not comply with Virginia's statute of frauds and cannot be enforced. See Va. Code § 11-2 (providing that "any agreement that is not to be performed within a year" must be "in writing and signed by the party to be charged or his agent"); see also Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 454 (4th Cir. 2004) (holding that the statute of frauds barred the plaintiff's "attempts to rely on alleged oral promises that [the defendant] made regarding a three-year employment contract").

For both of these reasons, Socol cannot plausibly allege that he had a protected property interest in continued employment based on the purported oral agreement with Haas. See, e.g., Haglin v. City of Algona, 42 F. App'x 55, 57 (9th Cir. 2002) (holding that plaintiff had no property interest in continued employment with the city because the mayor did not have authority to contract for a three-year term of employment); Miller v. Crystal Lake Park Dist., 47 F.3d 865 (7th Cir. 1995) (observing that "a promise not enforceable because of the statute of frauds does not create a 'property' interest"); Mahon v. Greenville Mem'l Auditorium, No. 90-2438, 1991 U.S. App. LEXIS 7881, at *6 (4th Cir. Apr. 30, 1991) (holding that an alleged oral employment agreement violated South Carolina's statute of frauds and therefore did not give rise to a protected property interest).

Socol's reliance on the Termination Policy fares no better. As indicated above, the provision on which Socol relies states that "[t]he Superintendent may dismiss classified employees and non-licensed administrative employees for good and just cause." Termination Policy at 2. It

does not state that non-licensed administrative employees shall only be dismissed for good and just cause. Nor does it state that non-licensed administrative employees will not be dismissed without just cause. Without such language, it is clear from existing precedent that the policy provision is insufficient to rebut the strong presumption of at-will employment in Virginia. See County of Giles v. Wines, 546 S.E.2d 721, 723 (Va. 2001) (holding that similar policy language indicating that an "'employee may be discharged for inefficiency, insubordination, misconduct, or other just cause'" was insufficient to rebut the presumption of at-will employment). Therefore, the Termination Policy provides "no property right which is protected by the federal constitution." Id. at 725; see also Foreman v. Griffith, 81 F. App'x 432, 437–39 (4th Cir. 2003) (applying County of Giles in affirming the dismissal of a property interest claim).

For these reasons, the court concludes that Socol has failed to allege sufficient facts to establish that he had a protected property interest in his continued employment as CTIO. Accordingly, he cannot sustain his property interest claim under the Fourteenth Amendment. Thus, the defendants' motion will be granted as to Count I.

## B. Liberty Interest

In Count II, Socol claims that he was deprived of a liberty interest without due process. More specifically, Socol asserts that the defendants violated the Fourteenth Amendment by failing to afford him adequate process before publicly disclosing the reasons for his termination.

"Public employees, even when lawfully discharged, enjoy the 'freedom to take advantage of other employment opportunities.'" Cannon v. Vill. of Bald Head Island, 891 F.3d 489, 501 (4th Cir. 2018) (quoting Roth, 408 U.S. at 573). "This includes the right to be 'free from arbitrary restrictions upon the opportunity for other gainful employment stemming from the reasons voluntarily given by government for lawfully terminating . . . at-will public employment.'" Id.

14

(quoting Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990)). Consequently, "a Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" Sciolino v. City of Newport News, 480 F.3d 642, 645–46 (4th Cir. 2007) (quoting Johnson, 903 F.2d at 999).

This particular type of due process claim has come to be known as a "stigma-plus" claim. See Evans v. Chalmers, 703 F.3d 636, 654 (4th Cir. 2012). The claim has two components. Cannon, 891 F.3d at 501. First, the plaintiff must establish that he has been deprived of a liberty interest. Id. To do so, "a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Sciolino, 480 F.3d at 646. Second, the plaintiff must demonstrate that he was deprived of such interest without due process, which in this context involves notice and an opportunity to clear the plaintiff's name. Cannon, 891 F.2d at 501–02.

In the amended complaint, Socol specifically alleges that he was not afforded any form of hearing or other opportunity to contest the purported reasons for his termination and attempt to clear his name. See Am. Compl. ¶¶ 76, 112. Consequently, the court must determine whether Socol has alleged facts implicating a protected liberty interest for which due process was required. In his amended complaint, Socol points primarily to two statements in support of his liberty interest claim. First, Socol alleges that Haas informed Moran and others of the alleged basis for his termination, namely that Socol had "'misused P-Cards deliberately and egregiously.'" Id. ¶¶ 93, 103. Second, Socol cites to the press release published on August 1, 2018, in which the School System announced that Socol was "no longer . . . employed by the school division." Press Release at 1; see also Am. Compl. ¶ 101. For the following reasons, the court concludes that

15

Socol has stated a plausible claim for relief based on Haas' statement to Moran and others regarding the alleged basis for Socol's termination.

In order to implicate a protected liberty interest, a plaintiff must demonstrate that a statement was made about him that placed a stigma on his reputation. Sciolino, 480 F.3d at 648. "For over thirty years, [the United States Court of Appeals for the Fourth Circuit] has held that a governmental disclosure places a stigma on a former employee sufficient to give rise to a liberty interest claim if it implies the existence of serious character defects such as dishonesty or immorality." Cannon, 891 F.3d at 502 (citations omitted). In assessing liberty interest claims, the Court has "distinguished statements that imply such serious character defects from statements that simply allege incompetence." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 308 (4th Cir. 2006) (citations omitted). Viewing the allegations in the light most favorable to the plaintiff, the court concludes that Haas' statement regarding the alleged basis for Socol's termination did more than suggest that Socol was incompetent as CTIO. Instead, by indicating that Socol deliberately and egregiously misused purchase cards, Haas insinuated that Socol engaged in dishonest conduct and therefore implied the existence of a serious character defect. See Cox v. N. Va. Transp. Comm'n, 551 F.2d 555, 557–58 (4th Cir. 1976) (affirming the trial court's determination that the plaintiff's liberty interest was infringed when her employer publicly linked her discharge to an investigation of financial irregularities, thus "insinuating dishonesty"); McNeill v. Butz, 480 F.2d 314, 319–20 (4th Cir. 1973) (concluding that federal employees' liberty interests were implicated by charges that "smack[ed] of deliberate fraud" and "in effect allege[d] dishonesty"). Accordingly, at this stage of the proceedings, the court concludes that Haas' accusation placed a constitutionally cognizable stigma on the plaintiff's reputation.

Socol has also sufficiently alleged that Haas' statement was "made public."  Sciolino, 480 F.3d at 647; see also Ridpath, 447 F.3d at 342 ("In order to invoke due process protections, a charge of a serious character defect must be publicly disclosed.").  The Fourth Circuit has held that the element of public disclosure is met if a statement was actually disseminated to a prospective employer or the public at large, or if there is a likelihood of actual disclosure.  Id. at 648 n.4, 650.  In this case, Socol alleges that Haas informed multiple people outside the School System of the alleged basis for Socol's termination, including Moran and Castner.  The court concludes that the plaintiff's allegations are sufficient to satisfy the second element.

To satisfy the third element, the plaintiff must allege that the stigmatizing statement was "made in conjunction with his termination or demotion."  Id. at 647.  This element is easily satisfied here.  Socol alleges that Haas' conversation with Moran took place on the same day that Socol was advised of his termination, and that the alleged basis for the termination was shared with Castner shortly thereafter.  Accepting the plaintiff's allegations as true, Haas disclosed the information at issue concurrently with, or in close proximity to, the plaintiff's termination.

To satisfy the fourth and final element, the plaintiff must allege that the stigmatizing statement was false.  Sciolino, 480 F.3d at 647.  In the amended complaint, the plaintiff expressly disputes the veracity of the accusation made by Haas.  Socol alleges that Haas falsely indicated that Socol had misused purchase cards, and that the assertion that Socol "did so deliberately and egregiously is also false."  Am. Compl. ¶ 94.  Socol emphasizes that he "was but one member of the Steering Committee," that "all of the members approved the purchases," and that he reasonably relied on Snoddy, Schmitt, and other members to "ensure procurement compliance."  Id. ¶¶ 79, 86.  Socol further alleges that no one on the Steering Committee received any improper benefit as a result of the furniture purchases and that the committee's only

goal was to complete the project on time and within budget. Id. ¶ 62. Such allegations, accepted as true and taken collectively, are sufficient to satisfy the fourth element. Thus, the court concludes that Socol has stated a plausible liberty interest claim based on Haas' statement to Moran and others regarding the alleged basis for Socol's termination.

The same cannot be said, however, of the press release. As indicated above, the press release simply reported that Socol was no longer employed by the School System. The press release did not indicate that Socol had been terminated, much less provide any reasons for his termination. Because the press release accurately reflected the plaintiff's employment status and included no additional statements that would imply the existence of serious character defects, the court concludes that the press release does not give rise to a viable liberty interest claim. See, e.g., Martin v. City of Glasgow, 882 F. Supp. 2d 903, 914 (W.D. Ky. 2012) (holding that a press release announcing that a public employee had been dismissed for violations of departmental policy did not support a liberty interest claim since it did not "bear[] upon the [the plaintiff's] immorality or dishonesty"); Miller v. Hamm, No. 1:10-cv-00243, 2011 WL 9185, 2011 U.S. Dist. LEXIS 141, at *38 (D. Md. Jan. 3, 2011) (emphasizing that "[m]ere innuendo, where the underlying statement is true, is not sufficient to give rise to a constitutional claim").

## C.    **Defendants' Liability**

Having concluded that the amended complaint states a plausible liberty interest claim based on Haas' statement, the court must determine whether the defendants are subject to liability under § 1983. The court considers in turn the potential liability of the School Board and Haas, the latter of whom is sued in both his official and individual capacities.

18

1.    **The School Board**

The School Board is a municipal entity for purposes of § 1983.   See Love-Lane v. Martin,
355 F.3d 766, 782 (4th Cir. 2004).   Municipal entities may not be held liable under the statute
merely because they employed a tortfeasor.   Monell v. Dep't of Social Servs., 436 U.S. 658, 691
(1978).   Instead, the plaintiff must plausibly allege that the execution of a policy or custom of the
municipal entity caused the violation of the plaintiff's constitutional rights.   See id. (explaining
that "it is when execution of a government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that
the government as an entity is responsible under § 1983").

In attempting to establish municipal liability, Socol alleges that Haas' actions "represent
the official policy of the Board and [the School System]."   Am. Compl. ¶ 115.   The Supreme
Court has recognized that "municipal liability may be imposed for a single decision by municipal
policymakers under appropriate circumstances."   Pembaur v. City of Cincinnati, 475 U.S. 469,
480 (1986)).   "To qualify as a 'final policy making official,' a municipal official must have the
responsibility and authority to implement final municipal policy with respect to a particular course
of action."   Riddick v. Sch. Bd. of the City of Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000)
(emphasis in original); see also Davison v. Randall, 912 F.3d 666, 689 (4th Cir. 2019) ("[I]n
assessing whether a municipality may be held liable for constitutional or statutory violations of
their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses final
authority to establish municipal policy with respect to the action ordered.") (emphasis and
alteration in original) (citations omitted).

"The question of who possesses final policymaking authority is one of state law."
Riddick, 238 F.3d at 523 (citing Pembaur, 475 U.S. at 483).   In answering this question, courts

"must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." Id. (internal quotation marks and citations omitted). As relevant here, Virginia law provides that "[t]he school board shall retain its exclusive final authority over matters concerning employment and supervision of its personnel, including dismissals and suspensions." Va. Code § 22.1-313 (emphasis added).

Although Socol correctly points out that "final policymaking authority may be delegated," Riddick, 238 F.3d at 523, the amended complaint does not plausibly allege that the School Board delegated any such authority in this case. Instead, Socol makes only vague and conclusory allegations in this regard, which are insufficient under Twombly and Iqbal. See Am. Compl. ¶ 115 ("Upon information and belief, the Board delegated authority to its agents and employees, including Dr. Haas, to formulate, develop and administer employment and personnel policies and practice for the Board and [the School System], including those policies and practices that caused Mr. Socol the damages he has alleged."). Moreover, the mere fact that Haas was permitted to dismiss non-licensed administrative employees for good and just cause "simply cannot establish that he had the broader authority to craft municipal policy." Robinson v. Balog, 160 F.3d 183, 190 (4th Cir. 1998). "In other words, there is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions." Hunter v. Town of Mocksville, 897 F.3d 538, 555 (4th Cir. 2018) (quoting Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 966 (4th Cir. 1995)). Thus, while Haas may have had the discretion to dismiss certain employees, "[t]he discretion to hire and fire does not necessarily include responsibility for establishing related policy." Greensboro Prof'l Fire Fighters, 64 F.3d at 966. In the absence of sufficient factual allegations from which the court can reasonably infer that Haas had final policymaking authority with respect to the actions at issue, the

20

court concludes that the plaintiff's attempt to establish municipal liability on this basis must be rejected. Robinson, 160 F.3d at 190.

The same is true for Socol's conclusory assertion that the School Board ratified Haas' actions. See Am. Compl. ¶ 117 (alleging, in the alternative, that "the Board's decision to ratify Mr. Haas's actions constitute a final decision of the Board"). Socol does not allege that members of the School Board knew that Haas intended to publicize the basis for Socol's termination without providing a name-clearing hearing, much less plausibly demonstrate that they ratified Haas' decision. In short, the plaintiff's bare allegation of ratification is insufficient to withstand review under Rule 12(b)(6). See Barrett v. Bd. of Educ., 13 F. Supp. 3d 502, 512 (E.D.N.C. 2014) (holding that the plaintiffs "failed to sufficiently allege facts supporting a theory of municipal liability under § 1983 that satisfies the 12(b)(6) pleading standard" where the plaintiffs' complaint offered "no non-conclusory factual allegations" in support of such claim); Lee v. O'Malley, 533 F. Supp. 2d 548, 553 (D. Md. 2007) (emphasizing that conclusory statements are insufficient to support municipal liability under Monell).

For these reasons, the court concludes that Socol has failed to plead sufficient factual allegations to support a claim of municipal liability under § 1983. Accordingly, Count II will be dismissed with respect to the School Board.

### 2. Haas

The court turns next to Socol's liberty interest claim against Haas, which is brought against him in both his official and individual capacities. Under Fourth Circuit precedent, the § 1983 claim against Haas in his official capacity as Superintendent is "essentially a claim against the Board and thus [must] be dismissed as duplicative." Love-Lane, 355 F.3d at 783 (citing

Kentucky v. Graham, 473 U.S. 159, 165–66 (1985)).  To the extent that the liberty interest claim

is asserted against Haas in his individual capacity, Haas asserts the defense of qualified immunity.

Qualified immunity protects government officials from civil liability "insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The burden of

proving the defense "rests on the party seeking to invoke it." Wilson v. Prince George's Cty., 893

F.3d 213, 219 (4th Cir. 2018).  To prevail under this defense, the defendant has to "show either

that there was no constitutional violation or that the right violated was not clearly established."

Gregg v. Ham, 678 F.3d 333, 347 n.7 (4th Cir. 2012) (citing Henry v. Purnell, 652 F.3d 524, 531

(4th Cir. 2011) (en banc)).

In this case, the court has already determined that the amended complaint plausibly alleges

that Haas violated the Fourteenth Amendment by failing to afford Socol adequate process before

publicly disclosing the reason for his termination.  Consequently, the court must decide whether

the constitutional right at issue was clearly established.  "For a right to be clearly established,

there need not be 'a case directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.'" Cannon, 891 F.3d at 497 (quoting Ashcroft v. al-Kidd,

563 U.S. 731, 741 (2011)).  Stated differently, "a constitutional right is clearly established when

'its contours [are] sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'" Ridpath, 447 F.3d at 313.

At the time of Socol's termination in August of 2018, it was clearly established that

"'notice and an opportunity to be heard are essential' when a public employee's liberty interest is

infringed by a charge implying such serious character defects as 'dishonesty[] or immorality'

lodged in the course of an injury such as failure to rehire.'" Id. (quoting Roth, 408 U.S. at 573).

22

"In the wake of <u>Roth</u> and its progeny, [the Fourth Circuit] has reiterated and expounded on the requirements of such a liberty interest claim on numerous occasions." <u>Id.</u> For instance, the Fourth Circuit has provided "concrete examples of the types of public statements implying the existence of serious character defects such as dishonesty and immorality." <u>Id.</u> at 314. The examples include a statement linking an employee's discharge to the investigation of financial irregularities. <u>Id.</u> (citing <u>Cox</u>, 551 F.2d at 557–58). At this stage of the proceedings, the court can discern no meaningful distinction between such statement and Haas' statement tying Socol's termination to the deliberate and egregious misuse of purchase cards. "In each of these scenarios, the charge at issue can be understood to insinuate dishonesty and other serious character defects." <u>Id.</u> Consequently, existing precedent gave Haas "fair warning" that the accusation at issue was "just the type of charge that implicates a protected liberty interest." <u>Id.</u>

Existing precedent also established that Socol was entitled to a name-clearing hearing prior to the public disclosure of false information regarding the basis for his termination. <u>Cannon</u>, 891 F.3d at 506 (citing <u>Sciolino</u>, 480 F.3d at 653). Because Socol alleges that he was not provided with any procedural safeguards before Haas publicly disclosed the stigmatizing and allegedly false information at issue, the amended complaint states a violation of the plaintiff's clearly established right to due process. <u>See</u> <u>Ridpath</u>, 447 F.3d at 315. Accordingly, accepting the allegations of the amended complaint as true, Hass contravened a clearly established Fourteenth Amendment right of which a reasonable person would have known. Hass therefore is not entitled to qualified immunity at this stage of the proceedings with respect to Count II.

## II.    Claims under state law

In addition to his claims under § 1983, Socol asserts two claims under state law.    In Count III, Socol asserts a claim for breach of contract against the School Board.    In Count IV, Socol asserts a claim for defamation per se against Haas.    The court will address each claim in turn.

### A.    Breach of contract

In support of the claim for breach of contract, Socol alleges that the School Board, through its agent, Haas, orally agreed for Socol to remain as CTIO for the duration of Haas' employment as Superintendent.    Socol further alleges that the Board breached the oral contract by terminating Socol's employment.

The court agrees with the defendants that this claim is subject to dismissal.    As indicated above, the amended complaint does not plausibly allege that Haas, who was then Deputy Superintendent, had authority to bind the School Board to an oral employment agreement.    See Va. Code § 22.1-313; Dennis, 582 F. Supp. at 542.    Additionally, Virginia's statute of frauds bars enforcement of an oral promise of employment for a term of more than one year.    See Walton, 379 F.3d at 454 (citing Va. Code. § 11-2); see also Falls v. Va. State Bar, 397 S.E.2d 671, 672–73 (Va. 1990) (holding that the statute of frauds barred enforcement of an employment contract that was to continue as long as the employee's job performance was satisfactory).    Under Virginia law, Haas was required to serve "an initial term of not less than two years," Va. Code § 22.1-60, and Haas advised Socol that he planned to serve two four-year terms.    See Am. Compl. ¶ 19; see also Pl.'s Br. Opp'n 12 (asserting that the plaintiff and Haas mutually understood that the plaintiff's "time as CTIO would span many years").    Because Socol and Haas allegedly agreed that Socol would remain in the position of CTIO for the entire duration of Haas' tenure, the purported employment agreement was not capable of being fully performed within one year.    Consequently, it is clear

24

from the amended complaint that the contract claim based on such agreement is barred by the statute of frauds.[4]   Accordingly, the defendants' motion to dismiss will be granted as to Count III.

**B.    Defamation per se**

In Count IV of the amended complaint, Socol claims that Haas defamed him by making statements to Moran and others regarding the purported basis for Socol's termination.  Socol contends that such statements are defamatory per se.

To state a claim for defamation under Virginia law, a plaintiff must plausibly show that the defendant (1) published (2) an actionable statement with (3) the requisite intent.  See Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993) (citing Gazette, Inc. v. Harris, 325 S.E.2d 713 (Va. 1985)).  "To be 'actionable,' the statement must be not only false, but also defamatory, that is, it must 'tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"  Id. (quoting Restatement (Second) of Torts § 559).

Certain statements are defamatory per se under Virginia law, including (1) "[t]hose which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment"; and (2) "[t]hose which prejudice such person in his or her profession or trade."  Tronfeld v. Nationwide Mut. Ins. Co., 636 S.E.2d 447, 449–50 (Va. 2006) (quoting Fleming v. Moore, 275 S.E.2d 632, 635 (Va. 1981)).

---

[4] Although a contract that does not satisfy the statute of frauds may still be enforced under certain circumstances, Count III does not state a claim for which relief could be granted, even in the absence of a writing. The partial performance doctrine cited by the plaintiff is an equitable remedy that "does not operate in actions at law for damages for breach of contract to take the contract out of the statute of frauds."  Lance J. Marchiafava, Inc. v. Haft, 777 F.2d 942, 946 (4th Cir. 1985); see also Mian v. Armenian Assembly of Am. Relief Fund, No. 93-2385, 1994 U.S. App. LEXIS 30511, at *6–7 (4th Cir. 1994) (rejecting the plaintiff's argument that his partial performance of the alleged employment contract removed the contract from the statute of frauds); Falls, 397 S.E.2d at 672 (holding that statute of frauds barred enforcement of an employment contract despite the fact that the employee left another job in reliance upon the employer's oral assurances and satisfactorily performed his job responsibilities for nearly two years).

25

For such statements, Virginia law presumes that the plaintiff suffered actual damage to his reputation and, therefore, no proof of damage is required. Fleming, 275 S.E.2d at 636.

A defamatory statement may be made in direct terms or by inference, insinuation, or implication. Perk v. Vector Res. Grp., 485 S.E.2d 140, 144 (Va. 1997). Although "pure expressions of opinion" cannot ordinarily form the basis of a defamation claim, "factual statements made to support or justify an opinion can." WJLA-TV v. Levin, 564 S.E.2d 383, 392 (Va. 2002) (internal quotation marks omitted). Accordingly, statements that are verifiably false or contain "provably false factual connotations" may be defamatory. Id.; see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 18–19 (1990) (holding that a statement that implies a false assertion of fact may be actionable even if it is couched as a statement of opinion). The issue of whether a statement is opinion or fact is determined by the court as a matter of law, as is the issue of whether a statement is defamatory. See Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998); Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985).

In moving to dismiss Socol's defamation claim, the defendants argue that the alleged statement that Socol deliberately and egregiously misused purchase cards is a non-actionable opinion. At this stage of the proceedings, however, the court is unpersuaded. In determining whether a statement is one of fact or opinion, the court must consider the statement as a whole rather than isolating one portion of the statement from another. Hyland v. Raytheon Tech. Servs. Co., 670 S.E.2d 746, 750 (Va. 2009). When considered in this manner, the court concludes that the statement at issue is not a pure expression of opinion. The assertion that Socol deliberately misused purchase cards "contains provably false factual connotations." Raytheon Tech. Servs. Co. v. Hyland, 641 S.E.2d 84, 91 (Va. 2007); see id. (holding that a statement suggesting that an employee was responsible for certain losses that adversely affected the company was not a

26

statement of opinion and could be the basis for a claim of defamation).   Additionally, Haas' "use

of the term 'egregious[ly]' may have implied an assertion of fact as to [the plaintiff's] state of mind

or intention."   Galarpe v. United Airlines, Inc., No. 3:17-cv-06514, 2018 WL 1586202, 2018 U.S.

Dist. LEXIS 56165, at *13 (N.D. Cal. Apr. 2, 2018); see also Hyland, 641 S.E.2d at 91 (noting that

the use of the word "significantly" in describing the plaintiff's job performance did not make the

challenged statement an opinion).   Accordingly, the court is unable to conclude that the statement

at issue is a non-actionable opinion.

       To the extent that the defendants also argue that Haas' statement is not defamatory per se,

the court disagrees.   Liberally construed, the accusation that Socol deliberately and egregiously

misused purchase cards while serving as CTIO implied that Socol was unfit to perform the duties

of the position and that he lacked honesty and integrity.   Accordingly, the court concludes that the

statement supports a plausible claim for defamation per se.   Thus, Count IV is not subject to

dismissal under Rule 12(b)(6).

## Conclusion

       For the reasons stated, the defendants' motion to dismiss will be granted in part and denied

in part.   The Clerk is directed to send copies of this memorandum opinion and the accompanying

order to all counsel of record.

       DATED: This 25ᵗʰ day of June, 2019.

                                        _____
                                        Senior United States District Judge

27