UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| IRA D. SOCOL, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| ) | |
| v. ) | Case No. 3:18cv00090 |
| ) | |
| ) | |
| ALBEMARLE COUNTY SCHOOL BOARD ) | |
| ) | |
| and ) | |
| ) | |
| MATTHEW S. HAAS, individually and as Superintendent ) | |
| of Albemarle County Public Schools, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THIRD-PARTY ALBEMARLE COUTY SCHOOL BOARD'S MOTION FOR PROTECTIVE ORDER**

Plaintiff Ira D. Socol ("Mr. Socol"), by counsel, respectfully submits this Memorandum in Opposition to the Motion for Protective Order and to Limit Deposition Examinations (the "Motion"), [ECF 42], filed by third-party Albemarle County School Board (the "Board"), and states as follows.

**Preliminary Statement**

In its Memorandum in Support of Motion for Protective Order and to Limit Deposition Examinations (the "Memoradum"), [ECF 43], the Board asserts that Mr. Socol's Notice of 30(b)(6) Deposition (the "Notice"), [ECF 43-1, p. 9-12], is (i) overbroad, including matter that is not relevant; (ii) will require preparation that is unduly burdensome; and (iii) was set for a date too soon to allow the Board to prepare one or more representatives to be deposed. As to the last

assertion, Mr. Socol has agreed to continue the deposition, so the Board will have ample time to prepare.

As to the former assertions–that the Notice is overbroad and preparation will be unduly burdensome–the Motion would have more punch if the Board had not already admitted, *sotto voce*, that the depositions to which the Board objects are relevant to Mr. Socol's remaining claims against Defendant Dr. Matthew S. Haas. [ECF 43, p. 3 ("the topics in issue are *almost entirely irrelevant*" (italics added))] Indeed, the topics are not merely relevant, as the Memorandum suggests, they are central to Mr. Socol's remaining claims, as set out in his Amended Complaint (the "Complaint"), [ECF 13].

## I. The Constitution and Work of the Steering Committee.

In large measure, this matter arises from the decision of Dr. Haas, on behalf of the Augusta County Public Schools ("ACPS"), to open a new pilot high school to be known as Albemarle Tech ("A-Tech") with less than one year's notice, and on a limited budget. [*Id.*, ¶¶ 30, 31 & 38] Dr. Haas turned to Mr. Socol to create a charter for the new school and named Mr. Socol as one member of the "Steering Committee" that would plan and execute the creation of A-Tech, as well as new space for the Department of Learning, Engineering, Access and Design ("LEAD") and a new professional learning center, both to be co-located with A-Tech. [*Id.*, ¶¶ 31 – 37] The membership of the Steering Committee included Lindsay Snoddy, then the Deputy Director of Building Services, and Rosslyn Schmitt, then the Director of Facilities and Finance and now the Chief Operating Officer of ACPS. [*Id.*, ¶35] Both Ms. Snoddy and Ms. Schmitt had extensive training and experience in finance and procurement, on which Mr. Socol relied in matters of procurement compliance. [*Id.*, ¶¶ 36 & 37]

### A. Furniture Acquisition.

In order to fulfill its mandate, the Steering Committee had to determine how to fit out and furnish of A-Tech and the other projects under its purview, for which it was allocated a total budget of $250,000. [*Id.*, ¶ 37] Certain members of the Steering Committee proposed using an independent interior decorator to select the furnishings for the project, rather than one of the interior directors on staff with ACPS. [*Id.*, ¶ 39] Mr. Socol objected to the expense, believing it to be more cost-efficient to handle that issue in-house; however, he was overruled by the other members of the committee and Jennifer Greehalgh was retained to select the furniture. [*Id.*]

Ms. Greenhalgh provided the Steering Committee with a proposal to furnish A-Tech and the professional learning center (but not LEAD) for $488,000, an amount roughly twice the Steering Committee's entire budget for furnishing and fitting out the entire space. [*Id.*, ¶ 40] For obvious reasons, the Steering Committee rejected Ms. Greenhalgh's proposal; instead, the Steering Committee asked Elodie Wolfe, an ACPS employee, to prepare an alternate proposal. [*Id.*, ¶ 41] Ms. Wolfe was both a member of LEAD, reporting to Mr. Socol, and under the direct authority of Office Manager Tanisha Thompson, who reported to Dr. Haas. [*Id.*]

Ms. Wolfe presented her proposal to the members of the Steering Committee, along with Ms. Greenhalgh's proposal for comparison. [*Id.* 42] The members of the Steering Committee reviewed each item or grouping of items and selected those to be acquired. [*Id.*] Ms. Wolfe placed on a Google documents spreadsheet, which was available to all of the members of the Steering Committee. [*Id.*] As completed, the spreadsheet included a description of the item, the project for which it was to be acquired, its advertised price, its purchase price, the date it was ordered, the specific ACPS Purchasing Card ("P-Card") to be used to acquire it, and, once acquisition was complete, the date it was received. [*Id.*]

The Steering Committee agreed to use LEAD P-Cards to make the furniture purchases as a convenience to committee member Debora Collins, then Assistant Superintendent for Student Learning and now Dr. Haas' successor as Deputy Superintendent, whose department would otherwise have had to make the purchases. [*Id.*, ¶ 44] Some purchases were made with multiple P-Cards, because the aggregate total of the purchase exceeded the available limit on a single P-Card. [*Id.*, ¶ 45] However, the aggregate furniture purchases for any single project (A-Tech, LEAD, or the professional learning center) did not exceed $50,000, and none of the individual pieces of furniture cost more than $5,000. [*Id.*, ¶¶ 46 & 47] Not only did the Steering Committee collectively approve the purchases and the manner in which they were made, [*Id.,* ¶¶ 43 & 44], but no individual member voiced any objection to such decisions. [*Id.*, ¶ 48]

### B. Furniture Acquisition Challenged.

On or about May 28, 2018, Mr. Socol received an email from Thomas Winder, a purchasing agent for Albemarle County, questioning the procedure used to purchase the furntiture. [*Id.,* ¶ 50] In light of which, Mr. Socol discussed the procedure with Reeda Deane, who worked in Fiscal Services for ACPS. [*Id.*] Ms. Reade assured Mr. Socol that the procedure used by the Steering Committee was within the normal practices of ACPS, saying "this is what we do all the time. Rosslyn [Schmitt] never said anything, no one's ever said anything." [*Id.*]

On June 11, 2018, the purchasing procedures and use of P-Cards were discussed extensively at the meeting of the Operational Cabinet of ACPS. [*Id.,* ¶ 52] Dean Tistadt, the then Chief Operating Officer of ACPS, objected to the way that Albemarle County characterized the furniture purchases, and Ms. Schmitt noted that the training by the County related to purchasing was "not the best", the implication being that such training was not sufficient to put the members

4

of the Steering Committee on notice that the County might question the procedure they used to purchase the furniture. [*Id.*]

On or about June 11, 2018, Mr. Socol, at his request, met with Mr. Winder to discuss the furniture acquisition. [*Id.* ¶54] Ms. Wolfe, Ms. Schmitt, Ms. Snoddy, and Assistant County Attorney Amanda Farley were also present. [*Id.*] At the meeting, Ms. Farley articulated the County's position that the furniture purchases for all three projects should have been aggregated and, had they been, such a purchase would have required competitive bidding. [*Id.*] In discussing next steps, Mr. Winder stated "you just need the Board to approve this, it happens a lot." [*Id.*] Mr. Winder also told Mr. Socol, in a later conversation, that the Department of Student Learning had engaged in "much worse" procurement behavior. [*Id.,* ¶ 58] Mr. Socol has reason to believe that such behavior was not considered serious enough for Mrs. Collins, the then head of that Department, to be disciplined. [*Id.*]

Shortly after the meeting with Mr. Winder and Ms. Farley, Mr. Socol met with Dr. Hass and asked if he, Mr. Socol, should attend the next meeting of the Board. [*Id.,* ¶ 56] Dr. Hass replied by saying "no, it's nothing; we'll take care of it." [*Id.*] On June 14, 2018, the Board approved the furniture purchases. [*Id.*] However, as Dr. Haas later told Mr. Socol, three members of the Board voted against ratifying the purchases and demanded that Mr. Socol be fired, presumably based on their belief that Mr. Socol had unilaterally made the decision whether and how to purchase the furniture. [*Id.,* ¶ 59]

## II. Mr. Socol is Investigated and Discharged.

On or about July 20, 2018, Mr. Socol met with John Gray, then Assistant Director of Human Resources for ACPS, and Claire Keiser, then Director of Educational Quality and now Assistant Superintendent, to discuss the furniture purchase. [*Id.,* ¶ 60] Mr. Socol believed that

5

the purpose of the meeting was to ensure that ACPS and the County did not come into conflict on purchasing procedures in the future. [*Id.*] However, at the meeting, Mr. Socol learned for the first time that his emails related to the furniture acquisition had been reviewed. [*Id.*] However, such review was conducted without reference to the date or context of the emails and, as a result, an email in which he objected to the hiring of Ms. Greenhalgh (an objection ultimately overruled by the Standing Committee) was being interpreted as an attempt by him to unilaterally seize control of the furniture purchases themselves, which were approved and made much later and were not the subject of the email in question. [*Id.*] Mr. Socol did his best to help Mr. Gray and Ms. Kaiser understanding the correct sequence and context of that email. [*Id.*] At that meeting, Mr. Socol had the distinct impression that Mr. Gray and Ms. Keiser were seeking to blame Ms. Wolfe for any alleged purchasing irregularities, something with which Mr. Socol did not agree. [*Id.*] Mr. Socol was not at this time told that his individual conduct was under investigation. [*Id.*]

On July 26, 2018, Dr. Haas texted Mr. Socol and asked him to come to a meeting "to resolve all of this." [*Id.*, ¶ 65] Mr. Socol asked if he should bring a lawyer, but Dr. Haas did not reply. [*Id.*] Mr. Socol met with Dr. Haas, Ms. Keister, and Brodie Downs, the Assistant Director of Human Resources for the County, on July 27, 2018. Dr. Haas immediately told Mr. Socol that "your time with Albemarle County has come to an end." [*Id.*, ¶ 66] He went on to tell Mr. Socol that "you have no rights here" and he could sign a resignation letter prepared by ACPS or he would be fired. [*Id.*] At that time, Mr. Socol was not shown any report, given the factual predicates for his termination, or given a list of the allegations against him, much less a chance to respond to them. [*Id.*, ¶ 67] Indeed, to date, Mr. Socol has not been provided any pre-deprivation opportunity to respond to the stigmatizing statements Dr. Haas has made about him. [*Id.*, ¶ 128]

### III. Dr. Haas Makes Statements that Injured Mr. Socol's Reputation.

#### A. Dr. Haas calls Dr. Pam Moran.

On July 27, 2018, the very day Mr. Socol was informed he was being terminated (but before his termination letter was even sent to him) Dr. Haas called Dr. Pamela R. Moran, ACPS's former Superintendent, to discuss Mr. Socol's termination. [*Id.*, ¶ 90] Dr. Moran was no longer an employee or agent of ACPS at that time, and so had no legitimate reason to know confidential personnel matters related to Mr. Socol. [*Id.*, ¶ 92] Moreover, as Dr. Haas was aware, Dr. Moran was not only a person with wide connections within the educational community generally, she was a business partner of and co-author with Mr. Socol. [*Id.*, ¶ 91]

In the course of his call with Dr. Moran, Dr. Haas placed the entire blame for the alleged procedural violation in the acquisition of the furniture by the Standing Committee on Mr. Socol alone, stating that Mr. Socol had been terminated because he "misused P-Cards deliberately and egregiously." [*Id.*, ¶ 93] Dr. Haas further stated that Mr. Socol had "admitted to the conduct in the report", [*Id.*, ¶ 96], which is a bit ironic, as Mr. Socol had not seen the report prior to or during the July 27, 2018, meeting, and therefore could not have admitted the specific allegations contained in it. [*Id.*, ¶ 67]

#### B. Dr. Haas Likely Made Similar Statements to Others.

Mr. Socol has reason to believe that Dr. Haas has made similar statements to others, including Dr. Kevin Castner, another former Superintendent of ACPS, and certain business partners, or potential business partners, of Mr. Socol. [*Id.*, ¶¶ 103-111] Moreover, in his July 27, 2018 phone call with Dr. Moran, Dr. Haas stated his prediction, and perhaps intention, that the manner of Mr. Socol's termination, arising from his refusal to sign the resignation letter, would impair Mr. Socol's professional prospects. [*Id.*, ¶ 111]

7

### C. Dr. Haas' Statements are False.

Mr. Socol alleges that Dr. Haas' statements are false. On the most basic level, Mr. Socol alleges that the acquisition of the furniture did not violate the procurement rules of ACPS and the County. [*Id.*, ¶¶ 88 & 114] Moreover, even if the acquisition of the furniture did violate the procurement rules, Mr. Socol alleges that the acquisition was the decision of the Steering Committee collectively, and cannot be laid at his door alone. [*Id.*, ¶ 86]

Mr. Socol further alleges that Dr. Haas' statement that he (or any member of the Steering Committed) engaged in "deliberate[]" misconduct is demonstrably false. [*Id.*, ¶ 114] To the contrary, Mr. Socol alleges that the Steering Committee's procurement practices were consistent with the procurement practices used within ACPS, based on his understanding the aggregation rules, [*Id.*, ¶¶ 87 & 88], the role of Ms. Snoddy and Ms. Schmitt on the Committee and their approval of the acquisition procedure, [*Id.*, ¶¶ 37 & 43,44, & 48] and the subsequent statements of Ms. Deene and Mr. Tisdadt. [*Id.*, ¶¶ 50 & 52] Far from engaging in deliberate misconduct, Mr. Socol and the other members of the Steering Committee acted appropriately and transparently.

Further, Mr. Socol alleges that Dr. Haas' statement that he (or any member of the Steering Committee) engaged in "egregious" misconduct likewise is demonstrably false. To the contrary, he has alleged a number of disputes between ACPS and the County, in which the two had similarly differed on the correct application of the procurement rules, which resulted, not in discipline for 'egregious' misconduct, but ratification by the Board. [*Id.*, ¶¶ 50, 52, 56 & 58]

Finally, Dr. Haas' statement that Mr. Socol "admitted to the conduct in the Report" is necessarily false. No report had been provided to Mr. Socol at the time Dr. Haas made that statement to Dr. Moran. [*Id.*, ¶¶ 67 & 96] Thus, Mr. Socol could not have admitted to allegations

8

contained in one, since he could not know them with any specificity. It should go without saying that, now that he has seen the report prepared by ACPS (the "Report"), he denies the allegations of misconduct that it contains. [*Id.*, ¶ 83] In particular, Mr. Socol can clearly establish that the email it cites as a 'smoking gun' is taken entirely out of context and out of time, and refers not– as the Report suggests–to the acquisition of the furniture but, rather, refers to the decision to retain Ms. Greenhalgh. [*Id.*, ¶ 85] Thus, the report's finding that the email constituted evidenced that Mr. Socol had unilaterally seized control of the procurement functions of the Steering Committee is not only incorrect, it is the very opposite of the truth. To the contrary, the email constitutes evidence that the Steering Committee made its own decisions, and the members of the committee had no qualms about rejecting positions championed by Mr. Socol.

## ARGUMENT

### I.  Applicable Standard.

As the Board concedes, a party seeking a protective order under Rule 26(c) of the Federal Rules of Civil Procedure bears the burden of establishing "good cause" by showing that "specific prejudice or harm will result if no protective order is granted." *United States ex rel. Davis v. Prince*, 753 F.Supp. 2d 561, 565 (E.D. Va. 2010) (quoting *Phillips v. Gen. Motors Corp.,* 307 F.3d 1206, 1210-11 (9th Cir. 2002).  In order for such an order to be issued the party seeking a protective order "must show that a clearly defined and serious injury will result from the discovery sought."  James WM. Moore et al., 6 Moore's Federal Practice 26.102[1] (3d ed. 2011).  "Conclusory or speculative statements about the need for a protective order and the harm that would be suffered without one are insufficient." Id.

This rule has full application to the taking of discovery depositions. "Courts are extremely hesitant to prohibit the taking of a discovery deposition and most requests of this

9

nature are denied." Id. (citing 8 C. Wright, A. Miller & F. Elliott, *Federal Practice and Procedure* § 2037, at 135 (1988 Supp.); *Medlin v. Andrew,* 113 F.R.D. 650 (M.D.N.C.1987)—(collecting cases)). Additionally, "[a] court generally will not limit discovery simply because it may be somewhat cumulative and duplicative. Rather, the discovery must be *unreasonably so* in light of the nature of the inquiry before the court will limit the discovery sought." James WM. Moore et al., 6 Moore's Federal Practice 26.60[2] (3d ed. 2011) (emphasis added) (citing Travelers Rental Co. v. Ford Motor Co., 116 F.R.D. 140, 145 (M.D.N.C. 1989)

### II. The Matter Designated in the Notice is Relevant to Mr. Socol's Claims.

Mr. Socol has two remaining claims against Dr. Haas. One is based in Section 1983 of the United State Code, alleging that Dr. Haas violated his XIVth Amendment liberty interests by making statements about Mr. Socol that created a stigma adversely affecting his future employment opportunities and business dealings without providing him any pre-deprivation process. [Complaint, ECF 13, ¶¶ 127 & 129] The other is a claim for defamation *per se* brought under Virginia law. [*Id.*, ¶¶ 140 & 141] Both claims are grounded in the allegation that Dr. Haas made false statements that stigmatized and defamed Mr. Socol; specifically, the alleged statements to the effect that (i) Mr. Socol violated the procurement policies of the ACPS; (ii) such violation was the unilateral act of Mr. Socol, and not the corporate act of the Standing Committee; (iii) such violations were deliberate and egregious; and (iv) Mr. Socol admitted to such misconduct, as it was detailed in the Report.

**A. Truth is a Defense to Both of Mr. Socol's Claims.**

Both of Mr. Socol's claims fail if Dr. Haas' alleged statements are true. *See, e.g., Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (in making a claim for violation his XIVth Amendment liberty interests, "a plaintiff must allege that the charges against him . . . were

10

false") *and Steele v. Goodman*, 382 F.Supp. 3d 403, 418 (E.D. Va. 2019) (if statements are true no actionable defamation exists under Virginia law). Accordingly, the truth or falsity of each of the alleged statements listed above is not only relevant, it is crucial to the resolution of Mr. Socol's claims. Turning to each claim in turn, it is clear how the designation in the Notice is tailored to elicit relevant testimony.

### 1. Statement One: Mr. Socol Violated the Procurement Policies of ACPS.

In order to know whether Mr. Socol violated the procurement policies of ACPS, one needs to know what those policies are. Accordingly, discovery into those policies is clearly relevant. Moreover, it is not enough to know what the policy is on paper; it is necessary to know how the policies has been applied by those who have the power to interpret and enforce them. All of which is to say that the interpretation and enforcement of the procurement policies of ACPS, the matter designated in item c of Exhibit A of the Notice (the "Designation"), are relevant to Mr. Socol's claims.

Next, it is necessary to move from the interpretation and enforcement of the procurement policies of ACPS in the abstract, to the concrete question: did Mr. Socol violate those policies? While Mr. Socol disputes the finding of the report, there is no question that ACPS itself relied on the report in making the decision to terminate Mr. Socol for his alleged misconduct. Surely the Board cannot now take the position that there is *no* relationship between the report, and the investigation upon which it is based, and Mr. Socol's alleged misconduct. Accordingly, the report and the investigation upon which it is based, which are among the matter identified in item a of the Designation, are relevant to Mr. Socol's claims.

### 2. Statement Two: Mr. Socol Unilaterally Violated the Procurement Policies.

In order to know whether Mr. Socol's unilaterally violated the procurement policies, it is necessary to know now the Steering Committee was constituted; how it made its decisions generally; the identity, authority and role of its members; how its members interacted; and how, specifically, decisions related to the acquisition of the furniture were made. All of which is to say that the constitution and deliberations of the Steering Committee provide important context for Mr. Socol's claims. Such knowledge helps answer the question whether the furniture procurement was a decision of the Steering Committee corporately or Mr. Socol unilaterally and are, therefore, entirely relevant to Mr. Socol's claims. It is just such matter that is identified in item b of the Designation.

### 3. Statement Three: Mr. Socol Deliberately and Egregiously Violated the Procurement Policies.

Even if Mr. Socol unilaterally violated the procurement policies of ACPS, it is necessary to determine the truth or falsity of Haas' statement that such alleged violations were deliberate and egregious. That determination can only be made in the proper context.

One element of the context relates to the particular pressures to which the Steering Committee was subject. The limited time, the limited budget, and the specific demands under which it worked are entirely relevant to the question whether the alleged procurement violations were egregious and deliberate, or merely a good faith response to the unusual challenges presented in trying to stand up an entire school in less than one year, while concurrently complete two other co-located, but distinct, projects. Thus, the constitution, deliberations, and decisions of the Steering Committee–again, matter identified in item b of the designation–are

relevant to setting the wider context within which the truth or falsity of Dr. Haas' statement that Mr. Socol engaged deliberate and egregious misconduct is to be determined.

Another element of the context relates to the practices prevalent with the ACPS at the time, how those practices were viewed by ACPS employees, and how alleged violations of the procurement procedures were addressed. Evidence tending to establish that context is relevant to the question whether Mr. Socol's alleged violation was deliberate, or whether he was acting in a good faith belief that he was within the established procurement norms of the ACPS. Likewise, evidence tending to establish that context is relevant to the question whether Mr. Socol's alleged misconduct could be characterized as egregious–warranting discipline and calling his character into question–or something merely to be ratified and overlooked, even if technically in violation of policy. Item c of the Designation identifies precisely such relevant matter.

### 4. Statement Four: Mr. Socol Admitted the Conduct Detailed in the Report.

Finally, discovery into the Report and investigation is relevant to determining whether, as Dr. Haas allegedly stated, Mr. Socol admitted the conduct detailed in the report. Such an admission would have arisen in the context of the investigation and termination of Mr. Socol, again matter identified in item a of the Designation.

### B. The Matter Designated in the Notice is Relevant to Dr. Haas' State of Mind.

The matter designated in the Notice is relevant not only on the question of the truth or falsity of the statements allegedly made by Dr. Haas, it is relevant to determining Dr. Haas' state of mind when he made such statements. Dr. Haas' state of mind is relevant for at least two reasons. First, because Mr. Socol has alleged facts that suggest that ACPS (and, by implication. Dr. Haas) was seeking a scapegoat in the wake of the evident unhappiness of certain members of the Board with the furniture acquisition. [Complaint, ECF 13, ¶¶ 56 & 60] Second, because Mr.

Socol has made a claim for punitive damages, which places Dr. Haas' intent in making the statements is squarely at issue. [*Id.*, p. 25]

In establishing Dr. Haas' state of mind, relevant considerations include (i) his existing assessment of Mr. Socol as an employee, which would have been informed by ACPS's personnel information and determinations as identified in item a of the Designation; (ii) the particular burdens and challenges under which the Steering Committee conducted its affairs, as well as the manner by which it made its decisions, matter identified in item b of the Designation; and (iii) Dr. Haas' understanding of the relevant procurement policies, the history of their interpretation and enforcement, and the appropriate disciplinary response (if any) for alleged violations of such policies, matter identified in item c of the Designation.

### III. The Notice of 30(b)(6) Deposition is Not Unduly Burdensome.

#### A. The Scope is Reasonable, Even Modest.

The Designation of the matter for examination in the Notice is reasonable, even modest. Item a relates to information regarding ACPS personnel decisions related to Mr. Socol's hiring, reviews and termination. That information is narrowly circumscribed, as it relates to one employee. Moreover, it is relevant to the issues presented in this case, for several reasons. To name just the most obvious, Mr. Socol's performance as an employee, particularly in carrying out his procurement functions, is relevant to any determination whether he acted "deliberately and egregiously", and also to whether Dr. Haas believed in good faith he had done so when he stated as much.

Item b relates to the work of the Steering Committee, which was only in existence for less than a single year.

Item c relates to the procurement policies of ACPS, surely a matter as to which it can speak easily and clearly. Moreover, that designation is limited to the five year period prior to the events in question in this case, ensuring that it is reasonable in scope. That timeframe also ensures relevance; it is entirely reasonable that the history of interpretation and enforcement of the procurement policies during that period would be known to Mr. Socol, Dr. Haas, and the other actors in this drama, and would therefore inform their view as to the contours of their obligations under those policies, and the appropriate response to the extent that an alleged violation of those obligations occurred.

### B. The Relevant Information is in the Possession of the Board.

By its nature, the matters identified in the Designations implicate information that Board and ACPS has, and Mr. Socol does not. Accordingly, "the parties' relative access to relevant information" militates strongly in favor of denying the Motion. F.R.C.P. 26(b). Moreover, conducting the 30(b)(6) deposition set out in the Notice may well serve all parties by preventing the necessity of conducting numerous individual depostions–of Mr. Gray. Ms. Keiser, Mr. Downs, etc.–in order to solicit much the same information. Finally, even were Mr. Socol to conduct such individual depositions, they would provide Mr. Socol the ability to secure the testimony of ACPS as an organization.

### C. The Notice is not Unduly Burdensome to the Board.

Any consideration of "the parties' resources" also militates strongly in favor of denying the Motion. *Id.* For all of the supposed concern of the Board, expressed in Mr. Holden's Declaration, that the Designation is overbroad and unduly burdensome, [ECF 43-1, p. 1-5], the Board has significant institutional resources at its disposal, to say the least. Specifically, it has full time human resources and/or financial personnel, [Complaint, ECF 13, ¶¶ 50 & 60], and an

annual budget in 2020-21 in excess of $193 million.[1] *See* 2020-2021 School Board's Adopted Budget (Albemarle County Public Schools), p. A-9 ), p. A-9, accessed at https://resources.finalsite.net/images/v1611755880/k12albemarleorg/z9w1u0rfoxbv0vqizs7h/FY21-SB-Adopted-Combined.pdf on May 3, 2021.

The matters identified in the Designation are hardly arcane, either due to the strangeness of the subject matter or the remoteness in time. Such matters include (i) the personnel record of one employee, (ii) the workings of a single committee over less than a single year, and (iii) the history of the interpretation and enforcement of ACPS's own procurement policies over a recent five years period. Indeed, even without referencing the litigation hold letter Mr. Socol sent to the Board, the School Board and ACPS are subject to document retention requirements with regard to virtually all of the documents necessary for the preparation of a corporate representative, *see* Va. Code Ann. § 42.1-76 *et seq.,* and is subject to Freedom of Information Act obligations as to documents related to much such information. *Id.* § 2.2-3700 *et seq.; see also* Jeffrey S. Gore and Roger C. Wiley, "Virginia Public Records Act Requirements", accessed at https://www.lynchburgva.gov/sites/default/files/COLFILES/City-Council-Manager/Clerk/17-18_PRA.pdf on June 3, 2021.

In short, the Board was under a legal obligation to retain the documents containing the information necessary to prepare a corporate representative. Likewise, the Board has ample resources, and trained and qualified individuals, in order to prepare a representative to testify. All that the Board lacks is the will to do so. Mr. Socol asks this Court to supply that will in the form of an order denying the Motion.

---

[1] *See* 2020-2021 School Board's Adopted Budget (Albemarle County Public Schools), p. A-9, accessed at https://resources.finalsite.net/images/v1611755880/k12albemarleorg/z9w1u0rfoxbv0vqizs7h/FY21-SB-Adopted-Combined.pdf on May 3, 2021.

WHEREFORE, Mr. Socol respectfully requests that the Court (i) deny the Motion, (ii) grant him his costs, including legal fees, incurred in replying to the Motion, and (iii) enter any further relief it deems just and proper.

Respectfully Submitted,
IRA D. SOCOL
By Counsel

_____ s/ Jeffrey R. Adams _____
Jeffrey R. Adams (VSB No. 43411)
Wharton, Aldhizer & Weaver, PLC
125 S. Augusta Street
Staunton, Virginia 24401
Telephone: 540-885-0199
Facsimile: 540-213-0390
Email: jadams@wawlaw.com
*Counsel to Ira D. Socol*

20009840

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys registered with the ECF system.

Jennifer D. Royer, Esq.
Royer Law Firm, P.C.
PO Box 4525
Roanoke, Virginia 24015
jroyer@royerlawfirm.com
*Counsel for Defendants*

_____ s/ Jeffrey R. Adams _____
Jeffrey R. Adams (VSB No. 43411)
Wharton, Aldhizer & Weaver, PLC
125 S. Augusta Street
Staunton, Virginia 24401
Telephone: 540-885-0199
Facsimile: 540-213-0390
Email: jadams@wawlaw.com
*Counsel to Ira D. Socol*
